[Civil No. 3689.   Filed April 27, 1936.]

[56 Pac. (2d) 1337.]

JOANNE B. PARKER, L. D. PARKER, Her Husband, and HERBERT R. WOOD, Appellants, v. GRACE McINTYRE, L. G. McINTYRE and B. M. PIERCE, Appellees.

Mr. O. T. Richey, for Appellants.

Mr. John W. Ross, for Appellees.

LOCKWOOD, C. J.—This is an appeal by Joanne B. Parker, L. D. Parker, her husband, and Herbert R. Wood, hereinafter called plaintiffs, from a judgment of the superior court of Pima county, in favor

of Grace McIntyre, L. G. McIntyre and B. M. Pierce, hereinafter called defendants, denying injunctive relief to plaintiffs.

The facts necessary for a determination of the appeal are not in serious conflict, and may be stated as follows: On the 15th day of July, 1931, one C. C. Parker filed in the office of the Arizona state water commissioner applications for permits to appropriate the waters of two springs, located in township 12 south, range 17 east, G. & S. R. B. & M. The applications showed that the water was to be used for stock purposes, and the works necessary to complete the appropriation were described as two small concrete dams and pipe lines therefrom, the estimated cost of the work in each case being given at approximately $100, and the date upon which the appropriation would be completed stated as December 1, 1931. No protests nor objections to these applications were ever made by anyone, but no action was taken on either of them until the 23d of January, 1934. The reason for this delay of something like two and one-half years does not appear. Whether it was due to laches on the part of the applicant or to a delay caused by the water commissioner cannot be ascertained from the record. These permits, when granted, provided that the actual construction work on the improvements should begin on or before January 21, 1935, and that complete application of the water to the proposed use should be made on or before March 21st of that year. On the 16th day of February Parker assigned the permits and his rights thereunder to Joanne B. Parker and Herbert B. Wood, plaintiffs herein. About Christmas, 1934, the plaintiffs sent one Frank Waters with materials, tools and food to the springs in question for the purpose of beginning the construction work required by

the permits. When he was about to commence his work, the defendants appeared and ordered him off, and refused to permit him to proceed. They were shown the permits from the water commissioner, but still refused to allow the work to go on, whereupon the plaintiffs, in order to preserve their rights, instituted this action to restrain defendants from interfering with their construction of the improvements and application of the waters, as required by the permits.

The defendants answered, admitting the issuance of the permits in question and their ownership by plaintiffs, but alleged that the rights sought thereunder had lapsed, and set up as an affirmative defense that they had instituted claims to possessory rights to the lands on which the springs were situated, under the public land laws of the United States, and that by reason thereof they were the owners of the springs and the waters thereof.

The case was tried to the court, which made certain findings, setting forth, in substance, the facts above stated and, in addition, the following:

"That the spring known as Keystone Spring is located upon the lands claimed by defendant, Grace McIntyre; that the spring known as Sheep Camp Spring is located on lands claimed by defendant B. M. Pierce; that the waters arising from said springs are insufficient in quantity to cause a flow of water beyond the boundary of the respective land claims of said defendants and are in fact Spring Waters. . . .

"That the water of said springs had been used for watering cattle purposes by the cattlemen of the district, but that plaintiffs or their assignors had not used said water and did not claim to have used said waters to the exclusion of all other persons. . . .

"That defendants use and require the waters of said Springs for Domestic Purposes. . . . "

From these facts, the court found, as conclusions of law, that the plaintiffs, because of lack of diligence and laches upon their part, could not invoke the doctrine of relation back to the time of their application to support their alleged appropriation, and that the land entries of the defendants protected them in their claim of ownership to the water and prevented any appropriation thereof by others subsequent to the defendants' entries.

In determining this case, it is advisable that we first restate some of the fundamental principles of the law of Arizona in regard to the appropriation of water. The first legislature of the territory of Arizona, having before it the conflicting rules of riparian rights under the common law and prior appropriation as followed by the Roman law, repudiated the former and established the latter as suited to the conditions prevailing in Arizona, and this rule has been consistently upheld by this court for many years, and has been approved as valid by the Supreme Court of the United States. The bill of rights at first limited the waters subject to appropriation as "streams, lakes and ponds capable of being used for the purpose of navigation or irrigation." The legislature, however, from time to time has enlarged this limitation by adding thereto other waters. In 1912, when Arizona became a state, the Constitution then adopted contained the following provisions:

"Section 1. The common law doctrine of riparian water rights shall not obtain or be of any force or effect in the State.

"Section 2. All existing rights to the use of any of the water in the State for all useful or beneficial purposes are hereby recognized and confirmed." Article 17, Constitution of Arizona.

In 1919 chapter 164 of the Session Laws of that year, commonly known as the "Water Code," was

adopted, which still further enlarged the list of appropriable waters. In 1928 the legislature made its latest declaration on this subject, which reads as follows:

"The water of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, waste or surplus water, and of lakes, ponds and *springs on the surface*, belongs to the public, and is subject to appropriation and beneficial use, as herein provided. Beneficial use shall be the basis, measure and limit to the use of water." (Italics ours.) Section 3280, Rev. Code 1928.

Up to 1919 the manner of making an appropriation was extremely simple; there being two methods which might be followed. The first was the posting of a notice of declaration of intent to appropriate and the filing of such notice in the office of the county recorder of the county in which the point of location was situated. This had to be followed by an actual application of water to the beneficial use contemplated, and the appropriation was not completed until such application had been made, when it became a vested right. The second method was by the mere application of water to a beneficial use, without the posting or recording of any notice whatever, and this right also became vested at the time of application. The only practical difference in the result of the respective methods was that under the first, if the actual application of the water was made within a reasonable time, the right of appropriation dated back to the filing of the notice, while in the second case it took effect only as of the date of actual application. In 1919 the Water Code (Laws 1919, chap. 164) provided a more elaborate and exclusive method of making an appropriation. Any person desiring to do so was required to make a formal written appli-

cation to the commissioner, describing quite fully the nature, purpose, and manner of the intended appropriation. The commissioner was instructed to make a full investigation of the application and to reject it if it conflicted with vested rights or was against the interest, welfare, and safety of the public; otherwise he was required to grant it to the extent that the water could be applied to a beneficial use. Nothing was said as to how long should elapse between the date of the application and the issuance of the permit. The applicant could not begin the construction of the works necessary for the appropriation until the application was approved, but, if a permit was issued, it might be assigned. It was then expressly provided that any rights acquired by virtue of a permit which had ripened into an appropriation *should date from the filing of the application in the office of the water commissioner.* There was a provision for a contest of the application and an appeal to the superior court from the decision of the commissioner.

■ The first question which we consider is whether or not the waters in question were, at the time of the application, subject to appropriation under the law of Arizona. This question is settled affirmatively by the finding of the trial court that the water which plaintiff attempted to appropriate was that of springs. We have discussed the nature of springs which are subject to appropriation under our statute in the case of *Fourzan* v. *Curtis,* 43 Ariz. 140, 29 Pac. (2d) 722, and in that case held, in substance, that the test was whether the waters of such springs in their naturally undeveloped state were sufficient in quantity to apply to any beneficial use, and the Water Code names watering of stock as one of the beneficial uses for which an appropriation can be

made. The court found that the waters of the springs had been used for the purpose of watering stock for a long period by the cattlemen of the district. It is true that the finding also stated that the waters arising from said springs are insufficient to cause a flow of water beyond the boundaries of the lands located by defendants, but, under section 3280, *supra,* it is not necessary that the waters of a spring flow beyond the boundaries of the land upon which they are to be found. Nor does the record bear out a suggestion that artificial development of the springs was necessary in order that they might be used for stock watering purposes. It shows that the springs ran the year round. We hold, therefore, that under the law of Arizona, as it existed in 1931, the waters of the springs in question were subject to appropriation.

The next question is, Did plaintiffs make a valid appropriation? The record shows clearly that on the 14th day of July, 1931, the plaintiffs' predecessor in interest filed with the water commissioner of the state of Arizona an application for a permit to appropriate the waters involved, which complied strictly with the law in all respects. It also appears that the lands on which they were located were, at the time the application was made, open, unoccupied government lands. The federal government has for many years recognized the right of residents to appropriate the waters found on the public lands of the western states, in accordance with local statutes and customs, and that any entryman of such lands took them subject to all valid, prior water rights. Act July 26, 1866, 14 Stat. 253; *Broder* v. *Natoma Water Co.,* 101 U. S. 274, 25 L. Ed. 790. That the state law was fully complied with in the making of the application in question cannot be questioned. That law further provides, in accordance with well-recog-

nized water law of all the western states, that, when the right actually vests by virtue of an application of the appropriated waters to a beneficial use, the date of the appropriation relates back to its initiation; in this case, as expressly stated by the statute, to the filing of the application. When, then, defendants attempted to acquire title to the land in question, they took it subject to any water rights which might have been initiated according to law, provided that these rights had not lapsed nor become void for some reason.

It is contended by defendants, and we think this is the only question that is open even to serious argument, that, by reason of the long delay from the making of the application to the attempted application of the water to a beneficial use, the doctrine of laches should be applied, and that plaintiffs' right to have their appropriations date back to the making of the application has failed. Under the statute, an applicant is precluded from attempting to apply the water or construct the works necessary for that purpose until *after* the permit issues. *After* its issuance, he has one year to commence the work. Sections 3286–3288, Rev. Code 1928. Plaintiffs attempted to begin the work within the year, but were prevented by defendants. The laches, if any exists, must be in the delay in *granting the permit,* and not in doing the work.

The doctrine of laches is not like the statute of limitations—a mere matter of time—but is properly a question of the inequity of permitting a claim to be enforced; this inequity being founded upon some change in the condition or relations of the property or the parties. It is evident, therefore, that there is nor can be no fixed nor determined rule for the application of this doctrine, such as exists with the statute of limitations, and each case must depend

upon its own peculiar circumstances. In other words, the question is addressed to the sound discretion of the court. In this case, however, it appears to us that there is an insuperable barrier to defendants' claim of laches. The laches claimed is not in the prosecution of the *present* action, but in a previous proceeding *quasi* judicial at least in its nature, which has already, in effect, gone to judgment. The water commissioner, while he is not, strictly speaking, a judge, is required to act judicially when he passes upon an application for a permit to appropriate water. The permit is, in effect, a judgment that the applicant is entitled to proceed with the work necessary to complete the appropriation. It is subject to appeal to the superior court. No effort was made to urge this defense before the permit was issued, nor was there ever an appeal from the action of the commissioner. We think that the attempt to raise the issue in the present proceeding as against the permit granted by the water commissioner is, in effect, a collateral attack upon the decision of the latter, and that this cannot be made.

█ It may be contended that defendants had no knowledge of the pending application, and therefore had no opportunity to object thereto, and so cannot be bound by the awarding of the permit. The Water Code expressly provides that all applications and permits issued in pursuance thereof shall be properly recorded by the water commissioner in a book kept for that purpose. We are of the opinion that the purpose and effect of such a statute is well set forth in the case of *Lewis* v. *State,* 32 Ariz. 182, 256 Pac. 1048, 1050, as follows:

"The whole object of all laws which require or permit instruments to be filed, registered, or recorded in any public office is that the general public,

if interested in the subject-matter of the instrument, may proceed to the proper office, and if therein they find an instrument duly filed, registered, or recorded, they may and must act with the presumption that such an instrument is indeed in existence and is genuine, and govern their affairs accordingly.

"The very fact that the state has specified an instrument may or shall be filed, registered, or recorded is evidence that in its public policy it deems it important enough for the general good of its citizens that a place and a manner be provided where the existence of the instrument may be established."

Defendants are presumed to have knowledge that under the law any right which they might acquire to the land in question would be subject to any legal appropriations of the springs in question. Such being the case, it was their duty to examine the records of the water commissioner to ascertain if any application to appropriate the water of the springs had been allowed or was pending, if they desired to oppose it, and, not having done so, they may not be heard to say that they had no constructive notice of the pending application.

But, even assuming that the plea of laches herein is not a collateral attack upon the decision of the water commissioner, and that defendants had no notice thereof until the present action was filed, we think the trial court erred in holding that laches appeared. While the question is one of discretion, it is judicial, and not arbitrary, discretion, and there must be some evidence in the record which would sustain the decision of the trial court. It is the presumption of the law that all public officers do their duty, subject, of course, to an affirmative showing that they have not done so. When, therefore, the water commissioner issued his permit at the end of two and one-half years, in the absence of any showing in the record to the contrary, we must presume that there

was a good and sufficient reason for the delay. There is nothing in the record of the present case which would justify a finding to the contrary, and the conclusion of law made by the trial court that plaintiffs did not exercise due diligence in prosecuting the work in question cannot be sustained. Of course, plaintiffs are not to blame for any delay occurring after they were ejected from the premises by the defendants.

Since it appears that the springs in question were subject to appropriation under the law of Arizona and that plaintiffs initiated a right to appropriate the waters thereof before the defendants had made their entry on the lands on which the springs were situated, and since plaintiffs proceeded to complete their appropriation in the manner provided by the law of Arizona until they were prevented from doing so by defendants, and since there is nothing in the record which would sustain a finding that they were guilty of laches, the judgment of the superior court of Pima county is reversed and the case remanded, with instructions to grant the injunctive relief sought by plaintiffs.

McALISTER and ROSS, JJ., concur.